**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**STANLEY F. WRUBLE III**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BRICE L. WEBB, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A05-1305-CR-263 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jerome Frese, Judge
Cause No. 71D03-0910-MR-23

**May 21, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BARTEAU, Senior Judge**

## STATEMENT OF THE CASE

After a jury trial, Brice Webb was convicted of murdering his girlfriend.  We affirm his conviction.

## ISSUES

Webb raises three issues for our review:

I.    Whether the trial court improperly advised him about how any choice to testify about his own voluntary intoxication would affect his ability to get a jury instruction on reckless homicide.

II.   Whether the trial court abused its discretion by refusing his tendered instruction on negligence.

III.  Whether the evidence is sufficient to sustain his conviction.

## FACTS AND PROCEDURAL HISTORY

In October 2009, Webb and his girlfriend Cherlyn Reyes lived in an apartment in South Bend.  One evening, their friends Shane Hillebrand and Ashley Gurrister came over to have dinner, drink, watch movies, and hang out.  Through the course of the night, Webb drank most of a big bottle of tequila.

When Ashley first arrived, she showed the group her newly-purchased gun.  Each of them handled the gun and fired it into the air just outside the apartment.  Later, Webb joked around by pointing the unloaded gun at Cherlyn and Ashley and dry firing it.  They told him to stop playing around.

Cherlyn and Ashley left to visit a friend.  Ashley did not want to take the gun with her, but she also did not want the men shooting it at the apartment.  So she took the clip and left the unloaded gun at the apartment.

2

When the women returned, Shane was still awake but Webb was sleeping on the couch. Ashley put the clip back into the gun. Cherlyn picked up Webb's phone and checked his call history. Angered by what she found, she slapped him across the face to wake him up. They yelled and physically fought with one another.

Ashley and Shane broke the couple apart several times. At one point, Ashley grabbed Webb in a bear hug and pulled him into the kitchen. Webb calmed down, but Cherlyn then ran into the kitchen and started hitting Webb while Ashley was still holding him. Webb broke an arm free and hit Cherlyn in the jaw, which knocked her unconscious. Ashley grabbed her gun, pointed it at Webb, and told him that if he hit Cherlyn again she would shoot him. Shane took the gun from Ashley and set it down, and things calmed down.

Webb waited for Cherlyn to regain consciousness. When she did, he helped her to the bathroom. After about a half an hour, they came out of the bathroom laughing and talking. Cherlyn was on her phone talking to a friend. She then went back into the bathroom. Webb passed Ashley and Shane in the living room on his way to the kitchen, then passed them again on his way back to the bathroom. Shortly after, they heard a gunshot.

Jessica Hoover was the person Cherlyn was on the phone with at the time of the shooting. Jessica heard Webb banging on the door and demanding to be let into the bathroom. She heard the door fly open, and Cherlyn yelled, "Brice, no, Brice, no." Tr. p. 58. She heard a bang and Webb yelling, "Baby, get up, Baby, get up, it will be okay,

3

come on, Cherlyn, wake up, it will be okay." *Id.* She then heard Ashley screaming, "Cherlyn, girl, wake up, wake up." *Id.*

Shane and Ashley found Webb leaving the bathroom with the gun in his hand. He said he had "just shot [his] baby mama," asked why there was a bullet in the chamber, and said he "didn't mean to." *Id.* at 99, 246. Cherlyn was lying on the bathroom floor. Shane took the gun from Webb. Webb hugged him and got emotional like he was crying, but he had no tears. He punched the ground a few times.

Shane suggested calling an ambulance, but Webb said "that he didn't want an ambulance there, that if an ambulance comes, the police would come, too, and he didn't want to go to jail for murder." *Id.* at 100. Instead, Webb asked him "to help him clean up the scene to make it look like it was a robbery or somebody else had broken in the door, kick in the door, trash the place to make it look like somebody else was in there." *Id.*

Shane told Ashley to take Webb to his house and pushed them out the door. When they left, Shane called the police. Webb was crying and hysterical during the ride, asking why there was a bullet in the chamber and saying he did not mean to kill Cherlyn. Ashley dropped him off at Shane's house, where Stasha Alexander was sleeping. Stasha awoke with Webb leaning over her bed telling her that he shot his baby mama and that he did not mean to. Stasha called Shane, who confirmed it was true. Stasha noticed that Webb acted as if he was crying but had no tears.

When the police arrived, Shane called Stasha and told her to tell Webb to go outside. Webb went out the door to the garage. He saw the police through the open

4

garage door and turned to go back into the house, but Stasha slammed the door and locked it. Webb was taken into custody.

Webb told the police in a videotaped interview that he had left the apartment to buy cigarettes from a nearby gas station, and when he returned, Cherlyn had already been shot.

The State charged Webb with murder and being a habitual offender. A jury found him guilty as charged. On appeal, the Indiana Supreme Court reversed, concluding the trial court should have instructed the jury on the lesser included offense of reckless homicide. *See Webb v. State* (*Webb I*), 963 N.E.2d 1103, 1108-09 (Ind. 2012). Specifically, the Court noted that although Webb testified he was not present during the shooting, the State's evidence showed he was there and produced a serious evidentiary dispute as to whether he acted knowingly or recklessly.

Webb was retried. At the conclusion of the State's evidence, the trial court advised Webb of his right to testify and his right not to testify. It noted certain risks, such as impeachment, that came with testifying.

The State then asked the court to instruct Webb about *Sanchez v. State*, 749 N.E.2d 509 (Ind. 2001), and *Orta v. State*, 940 N.E.2d 370 (Ind. Ct. App. 2011), *trans. denied*. The State explained:

> [I]t would be the State's position that while Mr. Webb would certainly of course be free to testify about all sort of matters relevant to that night, to the extent that he introduces evidence or claims that he was too intoxicated to form the requisite mental state of knowingly, that he would then not be entitled to a lesser instruction on recklessness, or Reckless Homicide I guess, pursuant to the Indiana Supreme Court's decision in *Sanchez* . . . .

5

Tr. p. 434. After a lengthy discussion, the court indicated it was unclear whether *Orta* was still good law in light of the Supreme Court's more recent decision in *Webb I*, said the issue may have some bearing on jury instructions, and noted it was not sure how it would rule. The court concluded:

> So there you go. I can't give you a heads-up on how I'm going to rule on that.
> I only know that the defendant has a right to testify. He has a right not to testify. He will be taking an oath to tell the truth, and we'll go from there.

*Id.* at 452.

Webb elected not to testify, and the trial court gave an instruction on reckless homicide. The jury found him guilty of murder and being a habitual offender. The court later sentenced him to ninety years. Webb now appeals.

## DISCUSSION AND DECISION

## I. ADVISEMENT OF RIGHT TO TESTIFY

Webb first contends the trial court improperly advised him about how any choice to testify about his own voluntary intoxication would affect his ability to get a jury instruction on reckless homicide.

The pertinent cases, as noted above, are *Sanchez v. State*, 749 N.E.2d 509 (Ind. 2001), and *Orta v. State*, 940 N.E.2d 370 (Ind. Ct. App. 2011), *trans. denied*. In *Sanchez*, the Supreme Court held that the Indiana statute prohibiting the use of voluntary intoxication evidence to negate the mens rea requirement in criminal cases did not violate the Indiana Constitution. 749 N.E.2d at 511. In *Orta*, this Court determined that the trial court properly applied *Sanchez* when it informed the defendant that he would not be

6

entitled to a reckless homicide instruction if he testified that he was too intoxicated (there was no claim his intoxication was involuntary) to know what he was doing and was too drunk to knowingly or intentionally act. 940 N.E.2d at 378-79.

Webb argues his conviction should be vacated because the trial court improperly advised him that he would forfeit a jury instruction on reckless homicide if he testified at all. This improper advisement, Webb asserts, caused him to waive his right to testify.

Our review of the record shows no error. The State repeatedly stated its opinion that Webb would not be entitled to the lesser instruction if he testified he was too drunk to act knowingly. As for the court, it said it was unsure how to reconcile *Orta* with *Webb I* but noted the issue might have a bearing on the jury instructions. We set forth the relevant portions of the discussion as follows.

After the State asked the trial court to instruct Webb on *Sanchez* and *Orta* and argued that Webb would not be entitled to a reckless homicide instruction if he introduced evidence that he was too intoxicated to form the requisite mental state of knowingly, the court explained the State's position:

> [O]ut of *Sanchez* and out of *Orta*, there were court decisions that said if a person testifying claims inability to remember any of this, claims voluntary intoxication whether by alcohol or drugs, then they are not entitled to offer a lesser included charge of Reckless Homicide in this case.

Tr. pp. 435-36. The court next discussed with the parties whether *Sanchez* and *Orta* predated the Supreme Court's opinion in *Webb I* and whether the Supreme Court addressed *Orta* in *Webb I*. The court then stated:

> [T]he State's position here is that under . . . *Orta*, that if you were to testify and say you were drunk and couldn't remember anything, that then the

7

State is arguing that the decision by the Court of Appeals, which was not explicitly overruled by the Supreme Court in the appeal in your first trial, . . . they're arguing that under that *Orta* case, then there should not be allowed a lesser included offense of Criminal Recklessness or Reckless Homicide . . . .

*Id.* at 438. The court added:

Now, I'm not taking a position -- I'm not responding to that other than I asked a question. But I'm saying there is the risk -- there is the possibility -- because that's going to get argued by these attorneys, and there's a possibility I may rule with them and say there can't be a reckless homicide . . . .

*Id.* at 439. Defense counsel asked for clarification of the State's position as to exactly what situation would make a reckless homicide instruction unavailable. The State explained *Sanchez* and *Orta*, then it stated how they applied to Webb's case:

Orta's defense was I was too drunk to know what I was doing, therefore I didn't have the sufficient capacity to act knowingly because I was drunk. So I didn't act knowingly. That was going to be his position.

The trial court instructed Orta, well, okay, but if you go down that road and testify that you got drunk and therefore you lacked capacity to know what you were doing or to be intentional or act knowingly, then you don't get reckless because that's what *Sanchez* says. The voluntariness of raising the glass to your mouth kicks in and supplies the mens rea for the knowing element of in that case murder.

That's exactly what we're talking about here. The State's evidence proved that the defendant walked into the bathroom with a loaded gun, pulled the trigger, and shot his girlfriend in the head from about twelve inches away or less.

From the opening, [the defense's] position was even yes, that's all going to be sort of acknowledged and undisputed; the issue is whether he acted knowingly. Can the State prove Murder, or is this going to be one of the lesser offenses or a lesser state of mind altogether?

It's the State's position that any sober rational person would clearly know in the sense of being aware of a very high probability that to point a loaded gun at another person's head and pull the trigger is killing that person.

If Mr. Webb's position is I was drunk and I didn't know the gun was going to go bang, or I didn't know it was going to kill her, or something

like that, I didn't act rationally and knowingly and carefully and the drunkenness contributed to my negligence or recklessness or some other state of mind, if Mr. Webb goes down that road, I think we're square into *Sanchez* and *Orta*, and he doesn't get Reckless Homicide anymore.

*Id.* at 444-46. At this point, the trial court talked at length about *Webb I*—again, where the Supreme Court concluded Webb was entitled to a reckless homicide instruction, despite his testimony that he was not present during the shooting, because the State's evidence showed he was there and produced a serious evidentiary dispute as to whether he acted knowingly or recklessly—and then stated: "So I don't know what that sort of reasoning does to poor trial judges like us who are supposed to deal with how we logically view what people are entitled to offer as instructions. So I'm in a bit of a quandary." *Id.* at 450.

The court's next statement is what Webb points to as reversible error: "*Orta* says you testify -- if the jury convicts you and you don't even get the reckless, you don't get the lesser included if you testify, but if you don't testify, then you can get it if the rest of the evidence is in flux enough." *Id.* at 451. We acknowledge this statement, taken by itself, is inaccurate. An accurate statement would be to say that Webb would not get the lesser instruction if he testified *he was too drunk to act knowingly*.

Nevertheless, the context of the entire discussion between the court and the parties shows the court was unsure of how *Orta* and *Webb I* would affect the final instructions. Indeed, after the statement Webb challenges here, the court said:

> So it takes better minds than mine to try and reconcile those two opinions. And I don't know what I'm going to do.
> I have to tell you it's in flux here, and it's at issue.

9

And I'm not being facetious here when I say you have a right to testify. But there are these two cases out there which a poor old guy like me doesn't know how to put them together. . . .

So there you go. I can't give you a heads-up on how I'm going to rule on that.

I only know that the defendant has a right to testify. He has a right not to testify. He will be taking an oath to tell the truth, and we'll go from there.

And the prosecutor can certainly use whatever he's saying in final arguments to try to argue why he shouldn't. And it may have some bearing on the instructions.

*Id.* at 451-52.

We thus disagree with Webb's claim that the court misadvised him he would forfeit a reckless homicide instruction if he testified at all. The discussion between the court and the parties shows Webb was adequately and repeatedly informed of *Orta*'s holding. In the end, though, the court refused the State's request to advise Webb along the lines of *Orta*, noting the Supreme Court's more recent decision in *Webb I* left the court with no clear guidance as to whether *Orta* remained good law. And in any event, Webb was represented by counsel who could explain the court's dilemma in determining what effect Webb's testimony might have on jury instructions. We conclude there was no error in the court's advisement.

## II. JURY INSTRUCTION ON NEGLIGENCE

Webb next contends the trial court erred by refusing his tendered instruction on negligence. We review a trial court's refusal of a tendered instruction for an abuse of discretion. *Springer v. State*, 798 N.E.2d 431, 433 (Ind. 2003). We consider: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to

support giving the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given. *Id.*

Webb's tendered instruction differentiated knowing acts from reckless and negligent acts. *See* Appellant's App. p. 42. His claim here is that the court abused its discretion by refusing the instruction because he was entitled to a jury instruction on negligence. He points to *Springer* to support his claim.

In *Springer,* the defendant learned that his son had been beaten up at someone's house after he tried to crash a party. The defendant drove to the home with a gun, loaded a bullet into the chamber, demanded to know the whereabouts of the person who beat up his son, and fired a shot through a wall. The bullet struck someone in a different room. At a jury trial for criminal recklessness, the court refused the defendant's tendered instruction on negligence. The Supreme Court affirmed the trial court's refusal, noting that negligence law "presupposes that an individual is engaged in lawful conduct which *can* be undertaken with due care for the safety of another person." 798 N.E.2d at 435. Because the defendant engaged in conduct in which he had no right to engage, he was not entitled to an instruction on negligence. *Id.* at 435-36.

Webb argues that, unlike the defendant in *Springer*, he was not engaged in any unlawful conduct. Instead, he argues, he was merely engaged in an argument with his girlfriend and likely assumed the gun was not loaded. Appellant's Br. p. 12.

But the undisputed evidence shows Webb *was* engaged in unlawful conduct—he pointed a gun at his girlfriend and pulled the trigger. *See* Ind. Code § 35-47-4-3 (1995) (knowingly or intentionally pointing a firearm at another person is a Class D felony, the

11

offense is a Class A misdemeanor if the firearm was not loaded). Therefore, pursuant to *Springer*, he was not entitled to a negligence instruction. The trial court did not abuse its discretion by refusing his tendered instruction.

### III. SUFFICIENCY OF THE EVIDENCE

Webb finally contends the evidence is insufficient to sustain his conviction. In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of witnesses. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict. *Id.* We affirm if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

To convict Webb of murder, the State had to prove beyond a reasonable doubt that he knowingly killed Cherlyn. *See* Appellant's App. p. 357; Ind. Code § 35-42-1-1(1) (2007).

The evidence most favorable to the verdict shows that Webb and Cherlyn engaged in a heated argument that quickly devolved into a physical altercation requiring Ashley and Shane to break the couple apart several times. At one point, Webb knocked Cherlyn unconscious. After she came to, he helped her to the bathroom. They emerged a half an hour later. Cherlyn returned to the bathroom, and Webb headed toward the bathroom after going to the kitchen. He banged on the bathroom door and demanded to be let in. When the door opened, Cherlyn yelled, "Brice, no, Brice no." Tr. p. 58. Webb pointed Ashley's gun at Cherlyn's head from within a foot away and pulled the trigger. *Id.* at 199. Ashley and Shane found Webb leaving the bathroom with the gun in his hand.

12

Webb did not want to call for an ambulance because "the police would come, too, and he didn't want to go to jail for murder." *Id.* at 100. Instead, Webb asked Shane to help him stage the scene to make it look like a home invasion robbery gone awry.

Despite this clear evidence, Webb challenges the knowing element of the crime. He argues that he and Cherlyn were on good terms by the time they emerged from the bathroom, that he had no way of knowing that Ashley had reloaded the gun, and that, after the shooting, he repeatedly asked Ashley why the gun was loaded.

Webb's argument is nothing more than a request to reweigh the evidence, which we may not do. The issue of whether Webb acted knowingly was placed squarely before the jury and decided by the jury. We will not disturb the jury's verdict where, as here, its decision was a reasonable one. We thus conclude the evidence is sufficient to sustain his conviction.

## CONCLUSION

We therefore affirm.

BAKER, J., and MAY, J., concur.

13